# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00585-COA

STEVEN JACOB MAHAFFEY                                                      APPELLANT

v.

WILLIAM CAREY UNIVERSITY                                                    APPELLEE

DATE OF JUDGMENT:            03/25/2014
TRIAL JUDGE:                 HON. M. RONALD DOLEAC
COURT FROM WHICH APPEALED:   FORREST COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:     THOMAS HENRY FREELAND IV
                             JOYCE MARIE FREELAND
ATTORNEYS FOR APPELLEE:      HEBER S. SIMMONS III
                             DORRANCE AULTMAN
                             SETH CHRISTOPHER HALL
NATURE OF THE CASE:          CIVIL - OTHER
TRIAL COURT DISPOSITION:     GRANTED SUMMARY JUDGMENT IN
                             FAVOR OF DEFENDANT/APPELLEE
DISPOSITION:                 AFFIRMED: 12/08/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## EN BANC.

### GRIFFIS, P.J., FOR THE COURT:

¶1.     Steven Jacob Mahaffey appeals the Forrest County Chancery Court's decision granting summary judgment in favor of William Carey University. This case stems from William Carey's dismissal of Mahaffey as a student of the College of Osteopathic Medicine (COM). The chancellor found William Carey's dismissal of Mahaffey was not arbitrary or capricious. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Mahaffey enrolled in the first class at William Carey's COM in August 2010.

¶3. In September 2010, Mahaffey received his first verbal warning from Dr. Jim Weir, the associate dean for academic affairs, for inappropriate comments. In November 2010, Dr. Weir again verbally admonished Mahaffey, this time for sending improper emails to Dr. Darrell Lovins, the dean of the COM at the time, failing to perform his work in anatomy labs, and attempting to get professors to change his grades. At this time, Dr. Weir told Mahaffey he had two strikes and a third strike would result in a review by the Promotion and Matriculation Committee (Committee).

¶4. Despite this warning, Mahaffey attempted to schedule his own rotations in contradiction to the COM's policies. Dr. Michael Murphy, on January 9, 2011, told Mahaffey to cease any attempts to schedule his own rotations and to email Dean Lovins with any contacts and questions about rotations. Mahaffey, however, continued to try to schedule his own rotations.

¶5. Also around this time, Mahaffey tried to solicit private access to textbooks and materials from the COM's e-book vendor. These two incidents were brought to the Committee's attention on September 29, 2011. The Committee, however, chose not to take disciplinary action at that time, but asked Dr. Weir to advise Mahaffey of the Committee's proceedings about him.

¶6. In November 2011, Mahaffey again tried to schedule his own rotation, this time with the Hattiesburg Clinic (Clinic). Then, on December 20, 2011, an incident occurred at the Clinic involving Mahaffey. Karen Smith, the director of nursing at the Clinic, reported that Mahaffey attempted to scrub into a surgery despite not having proper training in the

2

scrubbing procedures or malpractice-insurance coverage. Smith rebuffed Mahaffey's attempts to go into the surgery several times, until Mahaffey allegedly went into the surgical suite and broke the sterile field. Mahaffey was then removed from the premises, and Jaime Hill, the rotations coordinator at the COM, was notified.

¶7. After receiving the report from the Clinic, Hill advised Dean Lovins and Dr. James Turner of the situation. As a result, Dr. Weir informed the Committee and told Mahaffey a hearing on the incident would occur. On January 5, 2012, the Committee requested that Mahaffey attend the next Committee meeting. On January 6, 2012, Mahaffey met with Dr. Johnny Porter, chair of the Committee, to discuss his behavior and the pending Committee proceedings.

¶8. The Committee then met on January 10, 2012, with Mahaffey in attendance, and considered Mahaffey's conduct. Mahaffey responded to the Committee and sent a subsequent letter to the Committee. At the conclusion of the meeting, the Committee chose to place Mahaffey on probation.

¶9. On January 23, 2012, Dean Lovins met with Mahaffey to discuss the Committee's findings and its recommendations. Dean Lovins sent a letter to Mahaffey on February 16, 2012, which stated he was on "probation with conditions" based on his unprofessional conduct and set out the four conditions of his probation. The conditions dictated that: (1) Mahaffey see a professional counselor to address authority issues and working within the medical team environment; (2) Dr. Turner would schedule all rotations for him; (3) he address any concerns regarding other institutions and his education at the COM with Dr.

3

Turner; and (4) he meet with Dr. Weir monthly until August 2012 and thereafter with Dr. Turner. The letter further stated that the "[f]ailure to comply with any of these conditions will result in referral to the [Committee] for further discussion and recommendations."

¶10. Notwithstanding these warnings and his probation, Mahaffey again attempted to schedule his own rotations. Further, in July 2012, the director of a medical boards preparation vendor reported to Dr. Turner that she received several harassing and inappropriate emails from Mahaffey. An additional incident occurred in August 2012 when Mahaffey attended an orientation at South Central Regional Medical Center during which he parked in the incorrect parking area and improperly used his cell phone during the orientation. On August 8, 2012, Dean Lovins referred these incidences to the Committee for review.

¶11. On August 22, 2012, the Committee informed Mahaffey that, on August 29, the Committee intended to address his recent conduct. This meeting was cancelled due to a hurricane and to allow Mahaffey to take his boards. The Committee did not reschedule this meeting. At the March 26, 2013 meeting, the Committee reviewed Mahaffey's status and decided to keep him on probation.

¶12. Also in March 2013, Mahaffey completed a pediatrics rotation with Dr. Christine Chard. At the conclusion of the rotation, Mahaffey turned in his logs to Dr. Chard for grading and an evaluation. Dr. Chard determined that his logs were inaccurate and believed they were falsified. Subsequently, Dr. Chard failed Mahaffey for the rotation based on his incorrect logs, Mahaffey's interactions with the staff and herself, and one occasion when

4

Mahaffey was told to wait in the doctor's lounge before a procedure, but left the clinic instead.

¶13. The Committee once again evaluated Mahaffey's conduct during these incidents at the April 17, 2013 meeting. The Committee recommended Mahaffey's dismissal from the COM. On May 13, 2013, Dr. Porter forwarded the Committee's recommendation including an affidavit from Dr. Chard addressing the log discrepancies to Dr. Turner, who at that time was the dean of the COM.

¶14. On May 16, 2013, Dr. Turner sent Mahaffey a letter notifying him of his dismissal from school based on "repeated acts of unprofessional behavior, and failure of the Pediatrics Rotation." This letter stated he failed to meet the requirements of his probation and he could not appeal the decision. However, on May 23, 2013, Dr. Turner sent a second letter to Mahaffey stating that the "dismissal can be appealed in accordance with the appropriate sections of the Student Handbook for 2012-2013 within 10 days[.]"

¶15. Mahaffey appealed the decision to Dr. Turner. Mahaffey submitted a seventy-two-page appeal letter to Dr. Turner and the Committee. A hearing was held before the Committee on June 25, 2013. Mahaffey appeared, addressed the Committee, and answered questions.

¶16. On July 1, 2013, Dr. Turner sent Mahaffey a letter notifying him that he had denied his appeal and upheld the Committee's dismissal recommendation. Dr. Turner's letter stated that the dismissal was based on "disciplinary issues." The letter provided that "[a]fter due consideration and weighing all the issue[s] I find a pattern of unprofessional behavior that

5

is not consistent with that expected of a graduate[.]"

¶17.    Mahaffey appealed the decision to Tommy King, the president of William Carey. Mahaffey submitted a letter in support of his appeal to President King.  President King subsequently sent a letter to Mahaffey, which stated: "After hearing your appeal and reviewing all information provided by you and the [COM], I do not find egregious errors on the part of the [the Committee] nor [Dr. Turner] that would warrant overturning their decision."

¶18.    After this final dismissal decision, Mahaffey, on August 28, 2013, filed a lawsuit against William Carey in Forrest County Chancery Court challenging his expulsion as a breach of contract and seeking injunctive relief.

¶19.    On March 3, 2014, William Carey filed a motion for summary judgment.  Thereafter, Mahaffey filed a cross-motion for summary judgment.  A hearing was held on March 21, 2014.  The chancellor granted summary judgment in favor of William Carey from the bench after hearing the arguments of the parties.  In a written order issued on March 25, 2014, the chancellor found Mahaffey's dismissal was neither arbitrary nor capricious.  It is from this order that Mahaffey appeals.

STANDARD OF REVIEW

¶20.    The Mississippi Supreme Court has held that:

> Our appellate standard for reviewing the grant or denial of summary judgment is the same standard as that of the trial court under Rule 56(c) of the Mississippi Rules of Civil Procedure.  This Court employs a de novo standard of review of a lower court's grant or denial of summary judgment and examines all the evidentiary matters before it – admissions in pleadings, answers to interrogatories, depositions, affidavits, etc.  The evidence must be

6

viewed in the light most favorable to the party against whom the motion has been made. If, in this view, there is no genuine issue of material fact and[] the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant should be given the benefit of the doubt.

*Buchanan v. Ameristar Casino Vicksburg Inc.*, 852 So. 2d 25, 26 (¶3) (Miss. 2003) (quoting *Williamson ex rel. Williamson v. Keith*, 786 So. 2d 390, 393 (¶10) (Miss. 2001)).

ANALYSIS

¶21. Mahaffey asserted claims for a breach of contract and injunctive relief against William Carey. The chancellor granted summary judgment in favor of William Carey. Mahaffey claims the chancellor erred because there are disputes of material facts and the chancellor applied the wrong legal standard to find William Carey's actions were not arbitrary or capricious.

> I.     *Whether Mahaffey proved a genuine issue of material fact existed to overcome William Carey's motion for summary judgment.*

¶22. Mahaffey first argues that the chancellor erred in granting summary judgment because genuine issues of material facts existed. William Carey contends, however, that Mahaffey is judicially estopped from presenting this argument because he previously asserted a list of undisputed facts in his cross-motion for summary judgment.

¶23. "A material fact is one which resolves any 'of the issues, properly raised by the parties.'" *Suddith v. Univ. of S. Miss.*, 977 So. 2d 1158, 1166 (¶9) (Miss. Ct. App. 2007) (quoting *Strantz ex rel. Minga v. Pinion*, 652 So. 2d 738, 741 (Miss. 1995)). "Summary

7

judgment may not be a substitute for trying disputed factual issues." *Id.* (citation omitted). "A fact is neither material nor genuinely contested, however, merely because one party proclaims it so." *Id.* at 1167 (¶10).

¶24. Mahaffey presented several instances of disputed facts in both his opposition to William Carey's motion for summary judgment and his appellate briefs. The facts Mahaffey disputes, however, involve the incidents that William Carey deemed unprofessional. Mahaffey offered alternative explanations for each event William Carey considered in its disciplinary actions. But Mahaffey fails to prove any dispute as to any material facts.

¶25. The basis of Mahaffey's lawsuit is that William Carey acted in an arbitrary and capricious manner when the school dismissed Mahaffey. Thus, the action implicates the disciplinary actions taken by William Carey, not Mahaffey's unprofessional conduct. As such, Mahaffey failed to demonstrate any disputed facts of William Carey's disciplinary actions.

¶26. William Carey presented affidavits from several staff members involved in the disciplinary process. Dr. Weir's affidavit stated he counseled Mahaffey on September 14, 2010, November 1, 2010, and January 14, 2011, at the request of the Committee. Further, on October 20, 2011, the Committee warned Mahaffey of future action if his unprofessional conduct continued.

¶27. Dr. Turner, also through his affidavit, substantiated Dr. Weir's meetings and further attested to the proceedings of the Committee. Drs. Weir and Turner also detail that the Committee met with Mahaffey on January 23, 2012, after which the COM placed Mahaffey

8

on probation. Though Mahaffey disputes the warnings attested to by Drs. Weir and Turner, he does not challenge that the meeting occurred or that he was placed on probation.

¶28. Mahaffey also failed to show disputed facts about the proceedings through his probation or that he was dismissed while he remained on probation. Mahaffey does argue that he did not violate the conditions of his probation, and even if he did, his probation did not mandate a dismissal for any violation. However, none of the facts Mahaffey calls into dispute resolve the question of whether William Carey's decision was arbitrary or capricious.

¶29. Mahaffey does not dispute that the Committee met on April 17, 2013, and voted to dismiss him from the COM, that the Committee allowed for an appeal to Dr. Turner, or that Mahaffey submitted a seventy-two-page appeal letter. Further, Mahaffey does not dispute that Dr. Turner and Dr. King both affirmed the Committee's decision to dismiss him. Therefore, we find that Mahaffey failed to show a genuine issue of material fact in dispute as to William Carey's disciplinary actions that defeats summary judgment.

¶30. Because we find that Mahaffey failed to show a genuine issue of material fact in dispute as to William Carey's disciplinary actions, we also find William Carey's judicial-estoppel argument is moot. This issue is without merit.

> II.    *Whether William Carey's decision to dismiss Mahaffey for unprofessional conduct was arbitrary or capricious.*

¶31. The only issue that remains is whether William Carey's decision was arbitrary or capricious. Mahaffey contends that William Carey failed to comply with its guidelines prescribed in the student handbook during its proceedings against him. Due to this deviation from procedures, Mahaffey argues William Carey deprived him of a fundamentally fair

9

hearing, which renders the decision arbitrary or capricious.

¶32. "Courts have exercised reluctance in interfering with the disciplinary procedures and decisions of educational institutions, even where constitutional due process rights are guaranteed." *Beauchene v. Miss. Coll.*, 986 F. Supp. 2d 755, 768 (S.D. Miss. 2013). Because William Carey is a private institution, "causes of actions against [it] are usually limited to only breach of contract claims" rather than claims based on the protections afforded under the Fourteenth Amendment for students of public universities. *Id.* at 767-68. As such, "courts have given considerable discretion to private schools' decisions." *Id.* at 768.

¶33. Further, "[c]ourts have invoked different protections for disciplinary and academic expulsions." *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 540 (¶41) (Miss. 2000). "A disciplinary dismissal requires that the student be given oral or written notice of the charges and evidence against him and the opportunity to present his side of the story. In contrast, an academic dismissal calls for far less stringent procedural requirements." *Id.* (internal citations and citations omitted).

¶34. Mahaffey contends that the chancellor applied the wrong standard when he found that William Carey did not have to follow its handbook guidelines so long as an "informal give-and-take" occurred. "[A] student dismissed for academic reasons is not entitled to any type of due process hearing, and all that is required for disciplinary actions is an 'informal give-and-take' between the student and the administrative body dismissing him that would, at least, give the student 'the opportunity to characterize his conduct and put it in what he

10

deems the proper context.'" *Beauchene*, 986 F. Supp. 2d at 769 (quoting *Senu-Oke v. Jackson State Univ.*, 521 F. Supp. 2d 551, 559 (S.D. Miss. 2007)).

¶35. Mahaffey is incorrect in his assertion that the "informal give-and-take" standard in *Beauchene* applies to academic dismissals rather than dismissals for unprofessional conduct. *Beauchene* quotes *Senu-Oke* for the "informal give-and-take" proposition. *Id.* In turn, the *Senu-Oke* court quoted the Fifth Circuit in *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001). *Senu-Oke*, 521 F. Supp. 2d at 559. Though *Senu-Oke* and *Shaboon* involved academic dismissals, both courts used the "informal give-and-take" language in the context of solely disciplinary actions. *Senu-Oke*, 521 F. Supp. 2d at 559; *Shaboon*, 252 F.3d at 731. Therefore, the chancellor did not apply an incorrect standard.

¶36. Further, as previously stated, *Beauchene*, in citing *Hughes*, also indicated that only "oral or written notice of the charges and evidence against [the student] and the opportunity to present his side of the story" was required for a dismissal based on nonacademic misconduct. *Beauchene*, 986 F. Supp. 2d at 768 (quoting *Hughes*, 765 So. 2d at 540 (¶41)). Therefore, we must look to William Carey's conduct to determine if it complied with these basic requirements so that the decision was neither arbitrary nor capricious.

¶37. In *Beauchene*, the trial court reviewed a student's academic dismissal by a private law school to "determine whether [Mississippi College School of Law's (MC Law)] procedures were carried out with fundamental fairness so as to ensure that the decisions rendered were not arbitrary and capricious." *Id.* at 769. The trial court then defined the arbitrary and capricious standard as it applies to a private institution – "the [c]ourt may look to the degree

11

in which MC Law deviated from its established procedures and whether there was substantial evidence to support its decisions." *Id.*

¶38.     Mahaffey contends that William Carey deviated from its set of disciplinary procedures in the student handbook, which rendered the decision arbitrary and capricious. The student handbook outlines the procedures for handling instances of student misconduct. The guidelines dictate that a complaint "should be filed with the chairperson of the [Committee,]" which the Committee reviews and decides whether to conduct a meeting or not. The guidelines then hold that if the Committee chooses to meet, the student shall be notified to appear and will be afforded the opportunity to address the allegations. Then the Committee can issue one of four decisions: no action, probation, probation with conditions, or dismissal. Mahaffey contends William Carey failed to comply with these specific procedures.

¶39.     Mahaffey argues that no formal complaint was filed with the Committee and that he did not receive a notice or an opportunity to be heard at every meeting where the Committee discussed his actions. However, Mahaffey did receive notice of and did attend the Committee meeting on January 23, 2012, where he presented his version of events. After this meeting, the Committee placed Mahaffey on probation with conditions, which the Committee detailed in a February 16, 2012 letter. Further, when the Committee voted to dismiss Mahaffey on April 17, 2013, Mahaffey was allowed to appeal to Dr. Turner and to Dr. King. As part of his appeal, Mahaffey submitted a seventy-two-page letter detailing his version of events. All of these actions illustrate Williams Carey's compliance with the handbook.

¶40.     Despite this compliance, Mahaffey contends that he did not receive notice of either

the April 17, 2013 meeting or that his probation with conditions could lead to his dismissal. The record, however, shows that Mahaffey knew that dismissal was a consequence for a violation of his probation. Though Mahaffey's probation letter did not indicate dismissal was a possibility, the student handbook, on which Mahaffey heavily relies, states that "[p]robation is defined as a warning in that any future behavior/situations inconsistent with the professional behavior outlined in the *WCU Student Handbook* or deemed inappropriate by the [Committee] may result in [the student's] immediate expulsion[.]" The handbook further states that probation with conditions "includes all of the sanctions of probation[.]" Therefore, Mahaffey cannot claim he was not on notice that dismissal was a possibility for any probation violations.

¶41. As for the notice of the April 17, 2013 meeting, the record does not indicate that Mahaffey received a notice or attended the Committee meeting. However, the *Beauchene* court found that MC Law took some actions that deviated from its handbook, but that "the meetings and other communications between Beauchene and MC Law officials more than compensate[d] for their minor deviations from the Student Honor Code's written procedures." *Beauchene*, 986 F. Supp. 2d at 771. We find the same applies here.

¶42. The record indicates there were numerous emails, meetings, and conversations between Mahaffey and William Carey officials over the course of three years. William Carey placed Mahaffey on notice of his unprofessional conduct several times, and Mahaffey enjoyed several opportunities to defend himself. Therefore, we find William Carey carried out its procedures with fundamental fairness to Mahaffey.

13

¶43. Accordingly, we find William Carey's slight deviation from the handbook guidelines to be inconsequential, and the substantial evidence supported William Carey's decision. Based on these findings, William Carey's decision was neither arbitrary nor capricious. Thus, we affirm the chancellor's decision.

¶44. **THE JUDGMENT OF THE FORREST COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING, P.J., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITH SEPARATE WRITTEN OPINION. LEE, C.J., NOT PARTICIPATING.**

**JAMES, J., DISSENTING:**

¶45. Mahaffey was dismissed from William Carey University's College of Osteopathic Medicine (COM) for what was ultimately deemed "disciplinary issues" based on a "pattern of unprofessional behavior." Because I find that the chancellor erred, I would reverse the grant of summary judgment and remand this case to the chancery court.

**DISCUSSION**

I. **Whether there are genuine issues of material fact that preclude summary judgment.**

¶46. At the outset, I find that there are genuine issues of material fact that preclude the grant of summary judgment. The supreme court's decision in *University of Mississippi Medical Center v. Hughes*, 765 So. 2d 528, 532 (¶13) (Miss. 2000), which is the guiding case for university dismissals, involved no disputed facts. Here, however, several instances of misconduct used as grounds to place Mahaffey on probation and that also subsequently

14

formed the basis of his dismissal were disputed.

¶47.   In December 2011, an incident occurred at the Hattiesburg Clinic surrounding a surgery performed by Dr. William Thomas III, whom Mahaffey shadowed after expressing an interest in plastic surgery.  There was a dispute about whether Mahaffey was allowed to scrub-in that surgery.  A nurse alleged that Mahaffey scrubbed-in, broke the sterile field, and forced the surgeons to re-scrub.  The surgeon, however, signed an affidavit stating that he did not have to re-scrub and was unaware of Mahaffey breaking the sterile field.

¶48.   On August 1, 2012, Mahaffey began rotations at South Central Regional Medical Center in Laurel, Mississippi.  William Carey claims that during orientation, Mahaffey improperly parked his car in the hospital parking lot after being specifically told not to do so. Mahaffey contended that he was unaware that he improperly parked his car and moved his vehicle when he was asked to move.  William Carey claimed he was using Facebook and sending text messages at orientation.  Mahffey denied this allegation.  Mahaffey contended that his phone did not even have internet access, so it would be impossible to log in to Facebook.  Mahaffey also explained he only sent text messages during breaks and merely took notes on his phone.

¶49.   There was also a dispute of material fact regarding whether Mahaffey was in compliance with the express conditions of his probation.  It is undisputed, however, that the Committee's minutes reflecting a meeting on April 17, 2013, state that Mahaffey "seemed to be doing acceptabl[y] on probation well enough that the Dean asked the Committee if he could be taken off."  The minutes also state that at the meeting of March 26, 2013, the

15

Committee did not recommend that he be taken off probation despite the dean's report.

¶50. There was also a dispute of material fact regarding whether the "zero tolerance" probation also encompassed reasons other than those conditions enumerated in the probation letter. The chancellor found that Mahaffey understood the conditions of his probation and the ramifications of any future violation of his probation. However, Mahaffey claimed that based on his communications with William Carey personnel, he understood "zero tolerance" for future violations to be limited to the specific conditions of his probation according to his own interpretation of the student handbook.

¶51. There is no undisputed evidence that Mahaffey violated any of the four conditions of his probation. William Carey claimed that Mahaffey used a different name to schedule an appointment with a counselor other than the one assigned to him by the school. Mahaffey explained that he used his full legal name rather than Jacob because his medical records were maintained under his full legal name. The parties dispute whether setting up additional counseling by a different counselor would constitute a breach of a condition of his probation when he also maintained his counseling sessions with the counselor assigned by the COM.

¶52. William Carey also claimed that Mahaffey was asking too many questions constituting harassment of the staff of the Boards Boot Camp program. However, an email from the Boards Boot Camp personnel to Mahaffey is at conflict with this allegation because it unequivocally encourages students to ask questions.

¶53. There was a genuine issue of material fact regarding the discrepancy in the logs for Mahaffey's pediatrics rotation, which served as the basis for the failure of his pediatrics

16

rotation. Mahaffey explained the coding system he used was the system used by William Carey, which only had around a hundred or so codes identifying medical procedures as opposed to the 10,000 codes used by Dr. Chard at South Central Regional Medical Center for procedures. Mahaffey's account of the logs directly opposed the position taken by William Carey that his logs were intentionally falsified.

¶54. When viewing the evidence in the light most favorable to Mahaffey, summary judgment should not have been granted in favor of William Carey. Where doubt exists as to whether there is a genuine issue of material fact, the trial judge should err on the side of denying the motion and permitting a full trial on the merits. *Ellis v. Powe*, 645 So. 2d 947, 950 (Miss. 1994). Accordingly, I would find that there are genuine issues of material fact that preclude the grant of summary judgment.

**II.     Whether the chancellor reviewed the decision to dismiss Mahaffey using the appropriate standard.**

¶55. William Carey is a private institution. The distinction between a public university and a private institution is crucial. *Beauchene v. Miss. Coll*, 986 F. Supp. 2d 755, 767 (S.D. Miss. 2013). Policies and procedures of public universities regarding forms of academic dishonesty must comport with due-process requirements of the Fourteenth Amendment because a student's continued enrollment is deemed a protected property right. *Id.* However, these same protections are not available to students enrolled in private colleges and universities. *Id.* As such, "causes of actions against private colleges are usually limited to only breach of contract claims." *Id.* at 768.

¶56. The district court in *Beauchene* summarized the discretion afforded to institutions

17

when addressing dismissals based on academics as opposed to disciplinary dismissals.

> When reviewing dismissals that are academic in nature (such as plagiarism), as opposed to disciplinary dismissals, academic institutions are given even more discretion. *See Hughes*, 765 So. 2d at 534 ("A disciplinary dismissal requires that the student be given oral or written notice of the charges and evidence against him and the opportunity to present his side of the story. . . . In contrast, an academic dismissal calls for far less stringent procedural requirements." (citations omitted)); *Salcido v. Univ. of S. Miss.*, 2:11cv173, 2013 WL 2367877, at *4 n.2 (S.D. Miss. May 29, 2013) (university faculties must have the widest range of discretion in making judgment as to the academic performance of students and their entitlement to promotion or graduation because a graduate or professional school is the best judge of its students' academic performance and their ability to master the required curriculum).

*Beauchene*, 986 F. Supp. 2d at 768.

¶57. "Misconduct and failure to attain a standard of scholarship cannot be equated." *Id.* at 768-69 (quoting *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976)).

> To be clear, a student dismissed for academic reasons is not entitled to any type of due process hearing, and all that is required for disciplinary actions is an informal give-and-take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context.

*Id.* at 769 (citations and quotation marks omitted).

¶58. Unlike the less stringent procedural requirements of an academic dismissal, different protections exist for disciplinary expulsions. *Hughes*, 765 So. 2d at 540 (¶41). "A disciplinary dismissal requires that the student be given oral or written notice of the charges and evidence against him and the opportunity to present his side of the story." *Id.* (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). The dismissal in *Beauchene* was based on academic misconduct, but Mahaffey's dismissal was based solely on professional misconduct

18

according to William Carey. Although the trial court classified the dismissal as a mixed basis of disciplinary and academic grounds, the final dismissal letter omitted the previously cited academic ground. The final dismissal letter limited the basis of Mahaffey's dismissal to "disciplinary issues" based on a "pattern of unprofessional behavior."

¶59. I would find that the trial court incorrectly used the more deferential standard applicable to academic dismissals when evaluating Mahaffey's dismissal. Because William Carey explicitly removed the academic portion of the grounds for dismissal, I cannot say the "informal give and take" was sufficient in this case. The informal give and take exhibited in *Beauchene* was not provided to Mahaffey. *Beauchene* involved a student dismissed based on plagiarism on two separate occasions. *Beauchene*, 986 F. Supp. 2d at 762. The student was given multiple opportunities to explain the plagiarism, and he eventually confessed to his wrongdoing. *Id.* at 772. To the contrary, Mahaffey offered explanations for his alleged professional misconduct. Thus, a full trial on the merits is necessary in this case to resolve these disputed facts.

III. **Whether the procedures were carried out with fundamental fairness so as to ensure that the decision to dismiss Mahaffey was not arbitrary and capricious.**

¶60. It must be determined whether William Carey's procedures were carried out with fundamental fairness so as to ensure that the decisions rendered were not arbitrary and capricious. *Id.* at 769 (citing *Hughes*, 765 So. 2d at 535). Moreover, "[i]n balancing the Court's interest in safeguarding students from unfair procedures that result in arbitrary or capricious decisions, with the importance of giving judicial deference to an academic

19

institution's decision-making process, the Court may look to the degree in which [the institution] deviated from its established procedures and whether there was substantial evidence to support its decisions." *Id*. (citations omitted).

¶61. On February 16, 2012, Dean Lovins sent a letter to Mahaffey informing him that he had been placed on "probation with conditions" based on conduct and specifically excluded academics as a basis. The letter set out four conditions of probation and stated that the "[f]ailure to comply with any of these conditions will result in referral to the Committee for further discussion and recommendations." The conditions placed on Mahaffey were as follows: (1) that he see a professional counselor to address recognizing appropriate lines of authority and working within the medical team environment; (2) that only Dr. Turner would dictate all rotations for him; (3) that he address any concerns regarding any outside entity and his education at the COM with Dr. Turner; and (4) that he meet with Dr. Weir monthly until August 2012 and thereafter with Dr. Turner.

¶62. On April 17, 2013, the Committee voted unanimously to recommend that Mahaffey be dismissed for unprofessional conduct as well as for failing the pediatrics rotation. The minutes noted: "After multiple instances of unprofessional conduct, and an F in his rotation, Jacob Mahaffey should be dismissed." The minutes of the meeting erroneously noted that Mahaffey had failed twice. The Committee concluded that Mahaffey had "outright falsified his clinical logs."

¶63. On May 13, 2013, Dr. Porter forwarded the Committee's recommendation, including an affidavit from Dr. Chard addressing the log discrepancies to Dr. Turner. On May 16,

2013, Dean Turner sent Mahaffey a letter notifying him of his dismissal from the COM based on "repeated acts of unprofessional behavior, and failure of the Pediatrics Rotation." The letter stated that he "failed to meet the requirements of . . . probation," and that the decision "cannot be appealed." The letter referred to the dismissal procedure "in the appropriate sections of the student handbook for 2012-2013." However, on May 23, 2013, Dean Turner sent a second letter to Mahaffey stating that the "dismissal can be appealed in accordance with the appropriate sections of the Student Handbook for 2012-2013 within 10 days[.]" If he decided to appeal, Mahaffey was urged to consult with the associate dean for clinical affairs, Dr. Beth Longenecker, so she could inform him of the circumstances related to his clinical rotations, which led to their decision.

¶64. Mahaffey appealed the decision to Dr. Turner. A hearing was held in front of Dr. Tuner and the Committee on June 25, 2013. Mahaffey appeared, addressed the Committee orally, and answered questions. However, Mahaffey was not given an opportunity to present testimony of witnesses at the hearing. On July 1, 2013, the dean sent Mahaffey a letter notifying him that he had denied his appeal and upheld the Committee's dismissal recommendation, but stated that the dismissal was based on "disciplinary issues." The letter provided that "[a]fter due consideration and weighing all the issue[s] I find a pattern of unprofessional behavior that is not consistent with that expected of a graduate[.]"

¶65. Mahaffey was allowed to appeal the decision to the president of William Carey University, which he did. He was not allowed to be present at the appeal. Again, Mahaffey was not allowed to present testimony of witnesses at this appeal. The president, Tommy

King, sent a letter to Mahaffey stating that "after hearing your appeal and reviewing all information provided by you and the [COM], I do not find egregious errors on the part of the Committee nor the dean of the [COM] that would warrant overturning their decision." The letter concluded that the decision of the Committee would stand.

¶66. There is an implied contractual relationship between a university and its students. *Hughes*, 765 So. 2d at 535 (¶23). The chancellor determined that William Carey could deviate from the student handbook as long as there was informal give and take between the student and the university. I disagree. "[T]he student-university relationship is contractual in nature[,] and . . . the terms of the contract may be derived from a student handbook, catalog, or other statement of university policy." *Id.* at 534 (¶20). Based on the record before us, I would find that William Carey deviated from its handbook. William Carey deviated from its own procedures by first not allowing an appeal, citing the student handbook as authority. Days later, William Carey changed its position and informed Mahaffey that he was entitled to an appeal, again citing the same student handbook. William Carey also changed its position on the grounds for Mahaeffey's dismissal. Initially, Mahaffey's dismissal was based on disciplinary and academic grounds. However, William Carey ultimately characterized his dismissal as based solely on disciplinary grounds.

¶67. Due to William Carey's changes in its position as to its appeal process and grounds for dismissal, I cannot say that the decisions were not arbitrary and capricious. It does not appear based on the record before us that the decisions of William Carey were carried out with fundamental fairness in light of the email from Dean Turner on December 23, 2011,

22

stating, "I think it is time for Jacob to go home." Also, it does not appear fundamentally fair that Mahaffey was not allowed to be present at the final appeal to the president, undoubtedly the most important appeal. The circumstances surrounding this dismissal decision should be given the benefit of a full trial on the merits to determine whether or not Mahaffey was afforded fundamental fairness.

¶68. William Carey contends that a clause in the handbook disclaims any contractual relationship created by the handbook. I find that this self-serving disclaimer was not binding on Mahaffey. This argument is at odds with the holding of *Hughes*, which found that the terms of a student-university relationship may be derived from a student handbook. Here, William Carey deviated from its policy in not allowing Mahaffey to retake his pediatrics rotations after receiving a failing grade. It was the policy to allow a student to retake a course with a failing grade, while dismissal was recommended after failing three or more times. I would find that William Carey's deviations, based on the record before us, should have at least precluded summary judgment.

### IV. Whether judicial estoppel applies.

¶69. William Carey argues that Mahaffey should be judicially estopped from arguing against the grant of summary judgment in favor of William Carey because he filed a cross-motion for summary judgment. I disagree.

¶70. "Because of judicial estoppel, a party cannot assume a position at one stage of a proceeding and then take a contrary stand later in the same litigation." *Pursue Energy Corp. v. Miss. State Tax Comm'n*, 968 So. 2d 368, 377 (¶19) (Miss. 2007). Here, Mahaffey's

position has consistently been that there was a breach of an implied contract because William Carey deviated from its standard procedures and handbook, and did not act with fundamental fairness in dismissing him. I do not find that Mahaffey's position in his cross-motion for summary judgment is inconsistent or "at odds" with his current position taken on appeal. *See In re Estate of McLemore*, 63 So. 3d 468, 491 (¶71) (Miss. 2011). Thus, William Carey's argument is without merit.

## CONCLUSION

¶71.    For these reasons, I would reverse summary judgment granted in favor of William Carey and remand the case for further proceedings.